Donald STANG, Relator,

v.

**MINNESOTA TEACHERS RETIRE-
MENT ASSOCIATION BOARD
OF TRUSTEES, Respondent.**

No. C7–96–2410.

Court of Appeals of Minnesota.

July 15, 1997.

**346**

Rebecca H. Hamblin, Minnesota Education Association, St. Paul, Anthony R. Battles, Kelly, Hannaford & Battles, P.A., Minneapolis, for relator.

Hubert H. Humphrey III, Attorney General, Jon K. Murphy, Assistant Attorney General, St. Paul, for respondent.

Considered and decided by HUSPENI, P.J., and WILLIS and SCHULTZ*, JJ.

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

## OPINION

HUSPENI, Judge.

Relator Donald Stang challenges the decision of respondent Minnesota Teachers Retirement Association Board of Trustees to exclude $3,810 from Stang's 1992–93 salary for pension purposes. Because the $3,810 should not have been excluded from Stang's salary under Minn.Stat. § 354.05, subd. 35 (1992), we reverse.

## FACTS

Stang worked as an accounting instructor for Central Lakes College in Brainerd, Minnesota, and its predecessors for 29 years. He is a participating member of the Minnesota Teachers Retirement Association (TRA) and is considering retirement in 1997.

In 1991, the Brainerd Technical College (BTC) and the Staples Technical College (STC) merged to form the Brainerd Staples Technical College (BSTC), now Central Lakes College. The employees negotiated a new collective bargaining agreement (CBA) with BSTC. Before the merger, health benefits for the respective schools varied, and this disparity became a focal point in negotiation. BTC had paid $3,810 per employee per year to provide a health insurance package, and STC had paid $2,828 per employee to provide a health insurance package.

During the 1991–92 school year, the CBA for the merged schools provided that BSTC employees remain in their previous school district's group coverage for that year. BSTC paid the same premiums the former schools had paid before the merger. To compensate for the disparate benefits, BSTC paid the former STC employees an additional $982.

For the 1992–93 school year, however, the contract established a "flexible benefit plan," as follows:

> During the 1992–93 contract year, District 2190 [BSTC] will add $3,810 to the scheduled salary of each full-time faculty mem-

pointment pursuant to Minn. Const. art. VI, § 10.

ber for flexible benefits. (Section 9.5). The faculty member must estimate the amount he/she wishes to redirect for health and/or dental insurance premium reimbursement, health expense reimbursement, dependent care, or other expenses allowable under the IRS code.

\* \* \* \* \* \*

Faculty members shall remain in their respective health insurance programs during 1992–93.

Stang participated in the negotiating process for this contract. He submitted an affidavit claiming that the employees and the school intended the $3,810 to be salary. He stated that the language in the CBA requiring faculty members to remain in their health insurance programs for 1992–93 was incorrect and, in fact, teachers had the option, not the obligation, of continuing with their group coverage through their previous employers.[1]

The record indicates that under the 1992–93 contract each teacher could choose to deposit money into the flexible plan for various types of pre-tax expenses. Teachers wishing to buy group health insurance could direct funds from this plan to purchase the coverage through their previous school's program. Teachers could purchase additional insurance coverage to supplement those policies. Some teachers chose not to put any money into the flexible plan, and the employer paid them the $3,810 as regular salary. Other teachers put less than $3,810 into the flexible plan for insurance and received the difference as salary in their paychecks.

Stang chose to put a total of $4,900 into the flexible benefit plan for 1992–93. He used the money to purchase health and dental insurance from his previous employer, BTC, and to cover other medical expenses. TRA initially treated the additional $3,810 Stang received under the contract for year 1992–93 as salary for pension purposes and deducted pension contributions based on a

salary including that sum. Pursuant to an inquiry made in 1995, however, the TRA executive director, Gary Austin, informed the BSTC business manager that TRA would only count the $3,810 as "salary" to the extent that it was not used to purchase health and dental insurance premiums.

In April 1996, TRA notified Stang that he would receive an overpayment refund for erroneous contributions calculated on the $3,810 during the 1992–93 school year. Stang objected to the refund and requested it not be issued.[2] On May 13, 1996, the executive director denied Stang's request. Stang petitioned the TRA Board of Trustees (Board) for review of that decision. The Board heard the petition and affirmed the executive director's action. Stang filed for a writ of certiorari seeking this court's review.

## ISSUE

Did the Teachers Retirement Association Board of Trustees err in ruling that $3,810 of Stang's 1992–93 compensation was not "salary" for TRA pension purposes?

## ANALYSIS

■■■ On certiorari appeal from a quasi-judicial agency decision that is not subject to the Administrative Procedures Act, this court reviews whether the determination was arbitrary, oppressive, unreasonable, fraudulent, under erroneous theory of law, or without any evidence to support it. *Rodne v. Commissioner of Human Serv.,* 547 N.W.2d 440, 444–45 (Minn.App.1996); *see also Axelson v. Minneapolis Teachers' Retirement Fund Ass'n.,* 544 N.W.2d 297, 299 (Minn.1996). "[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown" by a reviewing court to the area of the agency's expertise. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977); *Rosinski v. Teachers Retirement Ass'n Bd. of Trustees,* 495 N.W.2d 14,

---

1. The 1993–94 contract allowed employees to participate in the state health plan, and the school paid those premiums for all employees. The $3,810 increase was removed from the employee contracts.

2. It is undisputed that an increase in Stang's income during the last five years of service would affect his pension amount. An employee's "high five salary," i.e., the salary from the highest five successive years of service, impacts an employee's TRA pension benefits. *See* Minn.Stat. § 354.44, subd. 6 (1996).

16 (Minn.App.1993). A reviewing court is not required, however, to defer to an agency's decision with respect to questions of law. *St. Otto's Home v. Minnesota Dept. of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn. 1989).

■ The Board determined that the $3,810 Stang received in 1992–93 was not salary but "payments in lieu of any employer paid group insurance coverage" under Minn.Stat. § 354.05, subd. 35 (1992). Stang contends the TRA Board erred in excluding the $3,810 from his salary and that amount should have been included for the purposes of calculating his TRA retirement contributions.

The parties dispute the role of the statute, the CBA, and their contractual intent in resolving the issue raised in this case. We conclude that our analysis must begin with application of the statutory language. The legislature created the TRA to provide a retirement fund for Minnesota's teachers. *See* Minn.Stat. ch. 354 (1996). The TRA Board manages the retirement fund and may only act according to its statutory authorization. *See* Minn.Stat. § 354.06, subd. 1 (1996) (management of teachers retirement fund is vested in TRA Board); *cf. Axelson*, 544 N.W.2d at 299–300 (reversing Board of Trustees for Minneapolis Teachers' Retirement Fund decision to allow member to purchase retirement service credits for years spent on leave of absence because it did not have statutory authority).

■ Construction of the teachers retirement statutes is a question of law, fully reviewable by this court. *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985). A court reviewing a TRA Board decision must first look to the statute and resolve any questions of interpretation before applying it to the facts of a case. A CBA between teachers and their employers is relevant to the extent that it is consistent with the law; the contracting parties may not override controlling law. *See Axelson*, 544 N.W.2d at 300–01 (agreement between Minneapolis Teachers' Retirement Association and teacher could not provide authorization for action that Association had no statutory authority to take).

The Teachers Retirement Act states that "salary" means

the compensation, upon which member contributions are required and made, that is paid to a teacher before any allowable reductions permitted under the federal Internal Revenue Code of 1986, as amended through December 31, 1988, for employee selected fringe benefits, tax sheltered annuities, deferred compensation, or any combination of these items.

Minn.Stat. § 354.04, subd. 35(a) (1992). Among other things, "salary" does not include

payments in lieu of any employer paid group insurance coverage, including the difference between single and family premium rates, that may be paid to a member with single coverage

Minn.Stat. § 354.04, subd. 35(b)(3).

The TRA Board argues that subdivision 35(b)(3) excludes the $3,810 paid to the teacher in this case because the employer paid the money pursuant to the CBA in place of employer paid insurance coverage. We find this interpretation both too broad for the plain meaning of the statutory exclusion and inconsistent with the remedial nature of the statute.

The plain language of the statute, we believe, compels an exclusion of payments from salary in those situations where an employer provides group insurance to all employees, but an employee declines to accept such coverage, and the employer compensates that employee with payments representing the cost differential. In such situations, an employee who receives the additional funds because he declined coverage should not be able to have a higher salary for the purposes of calculating retirement than those employees who accepted group insurance from the employer. Thus, the employee who declines group insurance coverage offered by an employer receives payments "in lieu of" an employer paid group insurance policy and is prohibited by subdivision 35(b) from including these payments as salary.

While the parties here agree that the additional salary was paid in 1992–93 as a means of compensating for insurance coverage, we

do not believe that the payments fit within the meaning of the statutory exclusion. In 1992–93, the employer did not provide employer paid group insurance coverage to all of its employees. The contract did not, in application, require all employees to have insurance, nor did it offer one insurance plan to all employees. Rather, the employees were given their salary (including the additional $3,810) and allowed to apply any amount or no amount toward approved expenses in a pre-tax plan. Although many of the employees used all or some of the $3,810 to purchase health insurance, several took the compensation in cash. Those employees did not receive the $3,810 as an offset for declining an employer paid group insurance program; they merely chose not to use their compensation to purchase insurance that year.

It appears to this court that the TRA Board implicitly recognized the interpretation we make here when it categorized as "salary" whatever portion of the $3,810 an employee chose not to apply toward an insurance plan. Moreover, we believe that the interpretation of the TRA Board regarding the $3,810 created an untenable result. It punished those who used the additional money to purchase insurance (by restricting or eliminating retirement contributions on those amounts) and rewarded those who failed to purchase insurance (by permitting all of the $3,810 to enhance retirement contributions). *See* Minn.Stat. § 645.17(1) (1996) (presumption that legislature does not intend unreasonable result).

Our strict interpretation of the exclusion is also consistent with the purpose of the statute. In *Mattson v. Flynn*, 216 Minn. 354, 359, 13 N.W.2d 11, 14 (1944), the supreme court clarified that teachers retirement statutes are for benefit of teachers who render "long and faithful service" and to support the public interest of "making the occupation of 'teacher' in this state more attractive to qualified person[s]." Because the teachers retirement statutes are remedial in nature, they are entitled to liberal construction to insure the beneficial purposes intended. *Id.* at 361, 13 N.W.2d at 15.

## DECISION

We conclude that Minn.Stat. § 354.05, subd. 35(b)(3), does not apply to exclude the $3,810 Stang received in compensation during the 1992–93 school year. Therefore, the TRA Board should have included those funds in Stang's salary when determining his TRA pension contributions. We reverse the TRA Board's decision.

**Reversed.**