In the Matter of the Disability
Earnings Offset of Mylan
MASSON.

No. A07–1571.

Court of Appeals of Minnesota.

July 29, 2008.

William A. Cumming, Hessian & McKasy, Minneapolis, MN, for relator Mylan Masson.

Lori Swanson, Attorney General, Rory H. Foley, Assistant Attorney General, St. Paul, MN, for respondent Public Employees Retirement Association.

Considered and decided by MINGE, Presiding Judge; KALITOWSKI, Judge; and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

Relator challenges the decision of the board of trustees of respondent Public Employees Retirement Association of Minnesota to deny relator's request to exclude her earnings from her preexisting employment as a community-college administrator when calculating the "reemployment" offset to her disability benefit pursuant to Minn.Stat. § 353.656, subd. 4(b) (2006). We affirm.

## FACTS

In 1991, relator Mylan Masson was hired as a full-time police officer with the Minneapolis Park and Recreation Board (the park board). Approximately three years later, Masson began a second full-time position as the assistant director of the criminal justice and law enforcement program at Minneapolis Community and Technical College (MCTC).

On July 27, 2001, Masson was injured in a motor-vehicle accident while on duty as a police officer. Masson's employment with the park board was terminated because the injuries Masson sustained in the accident resulted in a long-term disability that interfered with her ability to perform her duties as a police officer. But Masson's disability did not interfere with her ability to perform the duties of her position with MCTC, and she experienced no break in her employment with MCTC.

After the disability-related termination, Masson applied to Public Employees Retirement Association of Minnesota (PERA) for line-of-duty disability benefits. *See* Minn.Stat. § 353.656, subd. 1(a)(2) (2006) (providing for payment of disability benefits to members of PERA police and fire plan who are injured in line of duty). PERA approved Masson's request, and she began receiving disability benefits in May 2004.

PERA subsequently learned of Masson's employment with MCTC. In 2006, PERA requested information from Masson regarding her "reemployment earnings." Although Masson provided information regarding her earnings from MCTC, she maintained that these earnings were not from "reemployment" because she was employed by MCTC prior to the disability. In mid–2006, PERA also learned that Masson had received a payment of $39,000 for workers' compensation benefits. In November 2006, based on the information it gathered regarding Masson's earnings from MCTC and her workers' compensation benefits, PERA offset Masson's disability benefits and advised her that she had been overpaid $12,701.72 during the period between May 2004 and November 2006. PERA notified Masson that 25 percent of her monthly benefit payment would be withheld until it recovered the overpayment.

Masson objected to PERA offsetting her disability benefits based on her MCTC earnings, arguing that her MCTC position was not "reemployment" within the meaning of Minn.Stat. § 353.656, subd. 4(b) (2006). The PERA board of trustees reviewed Masson's objection and referred the matter for a fact-finding conference before an administrative law judge (ALJ).

After the conference, the ALJ issued findings of fact, conclusions of law, and a recommendation that the PERA board of trustees deny Masson's objection and request for recalculation of her police and fire plan line-of-duty disability benefits. The PERA board of trustees adopted the ALJ's findings, conclusions, and recommendation, and it denied Masson's request to exclude her MCTC earnings when calculating the "reemployment" offset to her disability benefit. This certiorari appeal followed.

## ISSUE

Did PERA err by concluding that relator's compensation for preexisting employment was subject to the offset provisions of Minn.Stat. § 353.656, subd. 4(b) (2006)?

## ANALYSIS

For the purposes of appellate review, a public-retirement-fund board, like the PERA board of trustees, is analogous to an administrative agency. *Axelson v. Minneapolis Teachers' Ret. Fund Ass'n,* 544 N.W.2d 297, 299 (Minn.1996). On certiorari appeal from a quasi-judicial agency decision that is not subject to the administrative procedures act, we review whether the determination was arbitrary, oppressive, unreasonable, fraudulent, under erroneous theory of law, or without any evidence to support it. *Stang v. Minn. Teachers Ret. Ass'n Bd. of Trs.,* 566 N.W.2d 345, 347 (Minn.App.1997). Although we afford an administrative agency deference within the agency's area of expertise, we do not defer to an agency's decision with respect to questions of law. *Id.* at 347–48. Statutory interpretation presents a question of law, which we review de novo. *In re Application for PERA Police & Fire Plan Line of Duty Disability Benefits of Brittain,* 724 N.W.2d 512, 516 (Minn.2006).

When interpreting a statute, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006). In doing so, we first determine whether the statute's language, on its face, is ambiguous. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001). A statute's language is ambiguous when its language is subject to more than one reasonable interpretation. *Amaral v. St. Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn. 1999). We construe words and phrases according to their plain and ordinary meaning. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980); *see also* Minn.Stat. § 645.08(1) (2006) (providing that words are construed according to their common usage). When the legislature's intent is clearly discernible from a statute's plain and unambiguous language, we interpret the language according to its plain meaning without resorting to other principles of statutory construction. *State v. Anderson,* 683 N.W.2d 818, 821 (Minn.2004).

PERA administers several disability-benefit plans for public employees, including the "police and fire plan" (the plan), which provides for payment of disability benefits to police officers and firefighters who, like Masson, become occupationally disabled because of injuries sustained in the line of duty. *See* Minn. Stat. §§ 353.64 (defining membership qualifications for the plan), 353.656, subd. 1(a)(2) (providing for line-of-duty disability benefits for members of the plan) (2006). But section 353.656, subdivision 4, sets forth a mandatory limitation on disability benefits:

> If a disabled member [of the plan] resumes a gainful occupation with earnings that, when added to the normal disability benefit, and workers' compensation benefit if applicable, exceed the disabilitant reemployment earnings lim-

it, the amount of the disability benefit must be reduced as provided in this paragraph. The disabilitant reemployment earnings limit is the greater of:

(1) the salary earned at the date of disability; or

(2) 125 percent of the base salary currently paid by the employing governmental subdivision for similar positions.

The disability benefit must be reduced by one dollar for each three dollars by which the total amount of the current disability benefit, any workers' compensation benefits if applicable, and actual earnings exceed the greater disabilitant reemployment earnings limit. In no event may the disability benefit as adjusted under this subdivision exceed the disability benefit originally allowed.

Minn.Stat. § 353.656, subd. 4(b) (2006).[1] The crux of the parties' dispute is the meaning of the term "reemployment" in section 353.656, subdivision 4(b).

Although they disagree as to its meaning, both parties argue that the language of subdivision 4(b) is unambiguous. The statute does not define the word "reemployment"; nor does the word "reemployment" have an ordinary or common meaning, because its usage is limited. And there is no caselaw defining "reemployment" in this context. But as both parties implicitly acknowledge, "reemployment" cannot comprise returning to a position covered by the plan. *Id.*, subd. 5a (2006) (requiring cessation of benefits when member returns to full-time or part-time employment in position covered by the plan).

Masson argues that "reemployment" refers solely to employment commenced after disability. Her interpretation reasonably comports with the common meaning of the prefix "re-" and the statutory phrase "resumes a gainful occupation." *See The American Heritage Dictionary* 1503 (3d ed. 1992) (defining "re-" as again or anew). PERA argues that "reemployment" refers to the resumption of employment after a disabling injury, which includes returning to preexisting employment or starting new employment. In support of its argument, PERA emphasizes the statutory prerequisites to payment of benefits. *See* Minn.Stat. § 353.656, subd. 4(a) (requiring impairment of member's salary in position covered by the plan and exhaustion of member's annual leave and sick leave before member is entitled to disability benefits).[2] Because both parties' interpretations of the statute are reasonable, we conclude that Minn.Stat. § 353.656, subd. 4(b), is ambiguous.

■ To ascertain and effectuate the legislature's intent when the words of a statute are susceptible of more than one reasonable interpretation, we examine several factors, including

(1) the occasion and necessity for the law;

(2) the circumstances under which it was enacted;

---

1. We refer to the 2006 version of the statute because it was the version at issue before PERA. We observe, however, that the legislature amended subdivision 4 by designating the existing text in the last paragraph of part (b) as part (c). 2007 Minn. Laws ch. 134, art. 4, § 20, at 1209–10. Since this amendment did not affect the meaning of the statute, our analysis applies equally to the amended version of the statute.

2. Moreover, a recent amendment to section 353.656, subdivision 4, specifying when line-of-duty disability benefits accrue informs our analysis of the legislature's intent with respect to these prerequisites. *See* 2007 Minn. Laws ch. 134, art. 4, § 24, at 1213 (providing that disability benefit accrues when applicant "is no longer receiving any form of compensation, whether salary or paid leave").

(3) the mischief to be remedied;

(4) the object to be attained;

(5) the former law, if any, including other laws upon the same or similar subjects;

(6) the consequences of a particular interpretation;

(7) the contemporaneous legislative history; and

(8) legislative and administrative interpretations of the statute.

Minn.Stat. § 645.16. We presume that the legislature intends to favor the public interest as against any private interest. Minn.Stat. § 645.17(5) (2006). Preservation of public funds is in the public interest. *See Lolling v. Midwest Patrol,* 545 N.W.2d 372, 376 (Minn.1996) (relying on section 645.17(5) in holding that public interest favored statutory interpretation permitting Department of Economic Security to consider employer's untimely objection to distribution of "reemployment insurance benefits").

The "police and fire fund" (the fund) is the source from which PERA pays disability benefits to members of the plan. Minn. Stat. § 353.65 (2006). The fund is established pursuant to a public policy and endowed with public funds. Minn.Stat. §§ 353.63 (articulating pertinent public policy that "special consideration should be given to employees of governmental subdivisions who devote their time and skills to protecting the property and personal safety of others"), 353.28, subd. 1 (requiring employers of members of the plan to pay majority of contributions to the fund, which they are required to pay "out of moneys collected from taxes or other revenue") (2006). The fund, therefore, is a public fund, and its preservation is in the public interest. *Cf. Jackson v. Minneapolis–Honeywell Regulator Co.,* 234 Minn. 52, 55, 47 N.W.2d 449, 451 (1951) (emphasizing that unemployment-benefit payments are "not made to discharge any liability or obligation of [the employer], but to carry out a policy of social betterment for the benefit of the entire state"); *Lolling,* 545 N.W.2d at 376 (citing *Jackson* for proposition that unemployment benefits are "state funds" and, therefore, section 645.17(5) raises presumption that legislature intended to limit their expenditure). Indeed, the legislature recognized the public interest in preserving the fund by explicitly framing section 353.656, subdivision 4, as a mandatory "[l]imitation on disability benefit payments."

We decline to embrace Masson's interpretation of the statute because, although facially reasonable, it leads to absurd results. Minn.Stat. § 645.17(1) (2006). For example, Masson concedes that, under her interpretation of the statute, had she terminated her employment with MCTC the day before her disabling injury but returned to MCTC in the same capacity the day after the injury, that "new" employment would be "reemployment" subject to the offset provisions of section 353.656, subdivision 4(b). By comparison, however, had Masson worked on only a limited basis for MCTC before her disability but increased her hours substantially after becoming disabled, that employment would not be considered "reemployment" and, therefore, all earnings from the MCTC employment would be excluded from the offset calculation, regardless of how significant they were. And if Masson wished to leave MCTC for alternate employment, even for good cause, her interpretation of the statute would force her to choose between subjecting the benefit to a possible offset because of new employment or staying with the preexisting employment so as to avoid the offset.

To avoid such absurd results and to fairly administer section 353.656, subdivision 4(b), PERA would have to examine

the facts of each member's postdisability earnings to determine whether they result from uninterrupted preexisting employment. This could result in a substantial administrative burden on PERA and, by extension, additional administrative costs. *See* Minn.Stat. § 645.16(6) (permitting examination of consequences of particular interpretation). PERA's interpretation of the statute, by contrast, provides a reasonable, uniform application of the statute that is consistent with the public interest in preserving PERA disability benefits for all qualified members.

■ The legislative history with respect to section 353.656, subdivision 4(b), informs our analysis. *See* Minn.Stat. § 645.16(7)-(8) (permitting consideration of legislative history and legislative interpretation of ambiguous statutory language). Specifically, in 1994, the legislature amended section 353.656, subdivision 4, creating subpart (b) and altering the previous limitation rule. 1994 Minn. Laws ch. 463, § 1, at 311–12. The legislative commission on pensions and retirement (the commission) reviewed the two bills that led to the statutory amendment.[3] In a report to the commission regarding the bills, the commission's deputy director explained that "[i]ncome replacement is the concept underlying the benefits, both for retirement and disability." Deputy Director of Minn. Legis. Comm'n on Pensions & Ret., Rep. on S.F. No. 793 & H.F. No. 985, at 1 (Mar. 2, 1994) (hereinafter Comm'n Rep.). The disability benefits are "intended to replace a *portion* of an injured worker's salary" to remedy the destruction of that worker's earning capacity. *Id.* (emphasis added). Thus, this expression of legislative intent indicates that the object of the

benefit is to effectively insure a certain minimum level of income for all qualifying members. *See* Minn.Stat. § 645.16(8) (permitting consideration of legislative interpretations of a statute to ascertain intent behind ambiguous statute).

The legislature did not directly address the unique circumstances presented here. Rather, the legislative record suggests that the legislature assumed that members of the plan would work solely in their capacity as police officers and firefighters, relying on overtime earnings to supplement their base salaries, if necessary, rather than seeking additional employment. *See* Minn.Stat. § 353.64, subds. 1, 2 (defining qualifications for membership in the plan and providing for membership of part-time police officers or firefighters only by resolution of governmental subdivision); Hearing on S.F. No. 793 Before the Senate Comm. on Gov't Operations & Reform (Mar. 29, 1994) (discussing importance of increasing disabilitant limit to account for reliance on overtime earnings); Comm'n Rep., at 2 (same).

When an occupationally disabled member of the plan is able to continue employment that is not covered by the plan, which the member started before the date of disability, the income-replacement purpose of the statute no longer applies and the public interest in preserving the fund prevails. Indeed, the commission's deputy director clarified that, "if a person regains sufficient earning power to replace that which was lost due to the disability, the obligation of the pension plan should be diminished and the reemployed disabilitant limit does this." Comm'n Rep., at 2. Thus, the legislature intended section 353.656, subdivision 4(b), as a limitation on income

---

**3.** The commission is a standing legislative body, established to study and investigate state public pension plans and report its findings to the legislature. Minn.Stat. § 3.85, subds. 1–2 (2006). The commission comprises ten members—five each from the Minnesota House of Representatives and the Minnesota Senate. *Id.,* subd. 3 (2006).

replacement when a member is able to return to, or retain, employment not covered by the plan. Accordingly, the offset provisions of subdivision 4(b) require PERA, when calculating a member's "reemployment" offset to disability benefits, to include any earnings from employment not covered by the plan, whether those earnings are from preexisting employment continued after disability or from employment commenced after disability.

## DECISION

PERA correctly interpreted Minn.Stat. § 353.656, subd. 4 (2006), to permit inclusion of relator's earnings from her preexisting employment as a community-college administrator when calculating the "reemployment" offset to her disability benefits.

**Affirmed.**